UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

20/20 Vision Center, LLC,

    Plaintiff,                             Case No.: 9:18-cv-80670-RLR

  vs.

Vision Precision Holdings, LLC, Stanton
Optical Florida, LLC, d/b/a Stanton Optical &
My Eyelab, T. Campen MD & Associates,
PLLC, and M&D Optical Franchise, LLC,

    Defendants.

_____/

## ORDER CONSTRUING DISPUTED CLAIM TERMS

THIS MATTER is before the Court on Plaintiff's Opening Claim Construction Brief [DE 70], Defendants' Responsive Claim Construction Brief [DE 73], and Plaintiff's Reply to Defendants' Responsive Claim Construction Brief [DE 74]. The Court has carefully considered each of these filings as well as the evidence submitted in support thereof. In addition, the Court held a hearing on October 17, 2018, and is otherwise fully advised in the premises.

## Introduction

This is an action for breach of contract, violation of trade secrets, misappropriation of trade secrets, unfair competition, unjust enrichment, and patent infringement. At issue in the patent infringement claim is United States Patent No. 9,230,062 ("the '062 Patent") issued to Plaintiff on January 5, 2016. Intended to facilitate vision and eye health examinations, the invention described in the '062 Patent uses a server to conduct eye examinations at a customer diagnostic center and to enable a remote eye-care practitioner to review and evaluate the patient's eye health and vision. In its Second Amended Complaint [DE 52], Plaintiff alleges that

Defendants' telemedicine-based systems for performing vision and eye examinations infringe claims 13, 14, 15, and 17 of the '062 Patent. The parties now seek construction of various terms used in those claims.

## Principles of Claim Construction

The construction of a patent, including terms of art within its claim, is a question of law for the Court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 384 (1996). "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)).

Courts begin by "look[ing] to the words of the claims themselves… to define the scope of the patented invention." *Id.* (citing *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics*, 90 F.3d at 1582). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Moreover, claims are not construed in a vacuum and proper claim construction "demands interpretation of the entire claim in context, not a single

element in isolation." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999). The context of the surrounding words of the claim must be considered; every word must be taken into account when construing a claim. *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011).

Beyond the claim language and the specification, "the court may also consider the prosecution history of the patent, if in evidence." *Vitronics*, 90 F.3d at 1582. (citing *Markman*, 52 F.3d at 980). "This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id.* (citing *Markman*, 52 F.3d at 980). "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83). It has long been established that all representations made to induce a patent grant, whether through claim amendment or argument, exclude any interpretation that may have been disclaimed or disavowed during prosecution to obtain allowance. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). "A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'" *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) (quoting *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 819 n.8 (Fed. Cir. 1989)).

Finally, while the Court is not obligated to construe terms if it determines that those terms have an ordinary meaning, "[w]hen the parties raise an actual dispute regarding the proper scope

of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Markman* 52 F.3d at 979). The Court is not bound by either party's proposed construction and it "may construe the claims in a way that neither party advocates." *Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1274 (Fed. Cir. 2012) (citing *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995)).

With these principles in mind, the Court now turns to the specific terms and claims at issue in this case.

### Terms and Claims at Issue

The parties agree as to the appropriate construction of two terms: "equipment controller" and "customer evaluation data." They do not agree as to the appropriate construction of "eye-care practitioner," "audio response system," and "based on the responses received from the customer via the audio response system, automatically adjusting ophthalmic equipment." These terms, appearing in bold font below, are all found in asserted claim 13 of the '062 Patent as follows:

> 13. A server for providing services related to eye health and vision examinations, wherein the server is configured to:
>
> permit **eye-care practitioners** to login to a web-based platform to administer eye examinations to customers over a network in real-time;
>
> track availability data associated with **the eye-care practitioners**, the availability data indicating **a set of eye-care practitioners** who are currently logged into the web-based platform and whether **each such eye-care practitioner** is currently engaged in providing a real-time eye examination through the web-based platform;
>
> receive a request over a network from a diagnostic center to select an **eye-care practitioner** to administer an eye examination to a customer, wherein the diagnostic center includes ophthalmic equipment comprising a set of instruments that are utilized in administering the eye examination and being coupled to an equipment controller that is configured to receive instructions or controlling the ophthalmic equipment;

in response to receiving the request, select the **eye-care practitioner** to administer the eye examination based, at least in part, on analyzing the availability data to identify **a subset of eye-care practitioners** who are logged into the web-based platform and not currently providing real-time eye examinations;

administer one or more tests to the customer during the eye examination conducted at the diagnostic center utilizing the ophthalmic equipment, the eye examination including an objective portion that utilizes the ophthalmic equipment to derive objective measurements pertaining to the one or more tests and a subjective portion that utilizes **an audio response system** that is configured to present questions to and receive responses from the customer pertaining to the one or more tests, wherein the subjective portion of the eye examination is administered using an iterative process that includes:

selecting questions to present to the customer based upon the objective measurements derived during the objective portion of the eye examination and the responses that are received from the customer via the **audio response system**;

**based on the responses received from the customer via the audio response system, automatically adjusting the ophthalmic equipment** utilized in administering the subjective portion of the eye examination; and

determining that the iterative process should be concluded in response to detecting that a particular combination of the responses received from the customer satisfies one or more conditions indicating that sufficient data has been collected for the subjective portion of the eye examination;

receive customer examination data generated by the ophthalmic equipment at the diagnostic center while administering one or more tests pertaining to the eye examination;

transmit at least a portion of the customer examination data pertaining to the one or more tests to a practitioner device associated with **the selected eye-care practitioner**;

receive customer evaluation data from the practitioner device associated with **the selected eye-care practitioner**;

wherein an eye health report based, at least in part, on **the selected eye-care practitioner's** review and evaluation of the customer examination data is provided to the customer.

DE 70-1, '062 Patent at 51:19 – 52:18

**Construction of Agreed Terms**

- **"equipment controller"**

The parties agree that this term should be construed to mean "a processing unit, micro-controller, or computing device that receives instructions to control ophthalmic equipment." *See* DE 69 at 5. The Court adopts the construction agreed to by the parties.

- **"customer evaluation data"**

The parties agree this term should be construed to mean "information generated by the eye-care practitioner based on a review and evaluation of customer examination data generated by the ophthalmic equipment during one or more of the eye examination tests." *See id*. The Court adopts the construction agreed to by the parties.

**Construction of the Disputed Terms**

- **"eye-care practitioner"**

Plaintiff proposes that the Court construe the term eye-care practitioner to mean "any eye care professional or other individual who is qualified, licensed, or otherwise capable of administering, monitoring, or reviewing data associated with, eye health and visual acuity tests and procedures." *See* DE 70 at 11. Defendants propose that the Court construe this term to mean "an eye care professional qualified and licensed to provide diagnoses and prescriptions based upon a review and evaluation of data and results generated by eye examination tests and procedures, in contrast to a technician who conducts eye examination tests and procedures but is not qualified and licensed to provide diagnoses and prescriptions based on review and evaluation of the test data and results." *See* DE 73 at 8.

The Court rejects Plaintiff's proposed construction of eye-care practitioner as being overly broad. Plaintiff argues that the eye-care practitioner can be "one or more individuals

involved in the administration of the eye examinations, controlling ophthalmic equipment, reviewing customer examination data, and/or producing customer evaluation data or eye-health reports" and that these tasks can be performed by a number of different individuals, including assistants or technicians that are unlicensed. *See* DE 70 at 12. However, all uses of the term eye-care practitioner within the four corners of the claim support a conclusion that the eye care practitioner selected to administer the eye examination is the same person that reviews and evaluates the customer examination data. Claim 13 provides that the server transmits customer examination data to a device associated with *the selected eye-care practitioner* and receives customer evaluation data from *the selected eye-care practitioner's device.* '062 Patent, 52:4-11. The parties agree that customer evaluation data is based on the eye-care practitioner's review and evaluation of the customer examination data. Claim 13 also recites that the server receives a request to select *an eye-care practitioner* to administer an eye examination to a customer and in response to such request, selects *the eye-care practitioner* to administer the eye-examination. '062 Patent, 51:30-32 and 38-40. Thus, the claim language is clear that the same eye-care practitioner selected by the server to administer the eye-examination is the same eye-care practitioner whose device receives the customer examination data and transmits back to the server the customer examination data based on the selected eye-care practitioner's review and evaluation of the data.

Plaintiff seeks to avoid this plain construction by arguing that there can be more than one selected eye-care practitioner. While Plaintiff correctly points out that the term "a" or "an" is often construed to mean "one or more" [DE 74 at 4], this is not a set rule in claim construction and the limitation must be read in the context of the claim and specification. *See Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011) (citing *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99

F.3d 1098, 1105-06 (Fed. Cir. 1996)). Here, as in *Harari*, the claim language makes clear distinctions between plural and singular by identifying a plural "set of eye-care practitioners," followed by a plural "sub-set of eye-care practitioners," and a singular "selected eye-care practitioner." Thus, the plain language of the claim makes clear that there is a single eye-care practitioner *selected* by the server to administer the eye examination to the customer and review and evaluate the customer examination data. This construction is consistent with the specification that describes a single eye-care practitioner that reviews and evaluates the examination data and there is no disclosure of multiple eye-practitioners performing this function.

Nevertheless, even if "an" eye care practitioner *selected* by the server were construed as more than one *selected* eye-care practitioner, there is no basis in the claim language for a construction for having different eye-care practitioners in a group of selected eye-care practitioners perform the different tasks required by the claim. That is, the same *selected* one or more eye-care practitioners would have to both administer the eye examination and review and evaluate the customer examination data because the server transmits and receives from the device of *the selected eye-care practitioner (regardless if there is one or more selected)*.

The intrinsic evidence of record, which includes the specification and prosecution history of the '062 Patent, likewise support that an eye-care practitioner that reviews and evaluates a customer's eye examination data must be a licensed professional. In particular, the Court finds support for its construction in the specification of the '062 Patent which draws a clear distinction between a practitioner and a technician. All instances of the specification that discuss the review and evaluation of customer examination data refer to a practitioner, not a technician. *See, e.g.,* DE 70-1 at 4:31-34, 5:6-8, 5:44-46, 10:10-12, 11:23-25, 11:39-53, 12:24-26, 15:34-37, 16:61-65,

17:6-9, 17:25-29, 17:55-57, 26:35-42, 26:49-51, 29:11-20, 33:41-48, 33:55-58, 35:24-32, 36:19-24, 36:31-35, 40:19-20, 42:40-43, 44:52-54, 45:42-44, and 46:16-18. Conversely, the specification includes numerous references to technicians, assistants, and/or equipment operators that can assist with eye examinations but do not review and evaluate customer examination data.

In view of the clear distinction made between a practitioner and technician throughout the specification, the Court is not persuaded that Plaintiff's citation to a single sentence in the specification is a definition for an eye-care practitioner. Plaintiff relies on the following sentence: "the remote eye care practitioner may be any eye care professional or other individual who is qualified, licensed, or otherwise capable of administering or monitoring one or more eye health and visual acuity tests and procedures and/or reviewing, analyzing and providing diagnoses, reports, prescriptions or recommendations based upon the data and results associated with administering such tests and procedures." DE 70-1 at 11:8-16. This sentence confounds numerous roles and tasks by using the disjunctive "or" as well as "and/or," and cannot stand for the proposition that an unlicensed individual can review and analyze eye-care examination data in order to provide diagnoses, reports, prescriptions, or recommendations.

The prosecution history is consistent with the specification. In responding to an Office Action, the Applicant[1] "amended independent claims 1 and 14 to incorporate features related to administering real-time eye examinations…" DE 67-2 at 642. Applicant explained that "a real-time or synchronous eye examination represents a live eye examination in which an eye-care practitioner actively participates and assists with administering eye tests to a customer." *Id*. at 639. "On the other hand, the eye-care practitioner may not actively participate or assist with administering eye tests during an asynchronous eye examination. Instead, the eye tests may be

---

[1] Plaintiff is the owner of the patent by virtue of assignment. DE 1 at 7.

performed by the customer himself/herself or with the assistance of a trained technician at the diagnostic center.  The customer examination data that is generated as a result of the tests may then be stored on a server. At some later point in time, an eye-care practitioner may evaluate the customer examination data and generate an eye health report for the customer." *Id*.  Therefore the statements made by the Applicant are consistent with the specification and make it clear that an eye-care practitioner must review and evaluate customer examination data.  Technicians, practitioner's assistants, and equipment operators may only be involved with administration of an eye exam and control of equipment – they are not qualified to review and evaluate examination data and produce customer evaluation data or eye health reports for the customers.

Based on the intrinsic evidence before it, the Court concludes that an eye-care practitioner as used in claims 13, 14, 15, and 17 of the '062 Patent must be a licensed professional.  Plaintiff's proposed construction is overly broad and it fails to address express claim language requiring review and evaluation of customer examination data by the eye-care practitioner.  The Court is likewise unpersuaded by Plaintiff's argument that a team may conduct the eye examination because the ultimate review and evaluation of customer examination data necessitates a licensed professional.  *See* Hrg. Tr. at 94:19 – 95:9.  While a particular review and evaluation of customer examination data might not result in the issuance of a prescription or a diagnosis of a disease, the review and evaluation must be conducted by a licensed professional because of the possibility—indeed, probability—that a prescription will be issued.  After all, the purpose of the eye-examination according to the '062 patent is to check for, detect, and diagnose diseases and changes in the eyes and vision. '062 Patent at 1:53-60.  Only a licensed practitioner can perform such a review and evaluation, and the evidence supports  that one skilled in the art understands this reality.  There is no dispute that all fifty states require that a licensed

professional diagnose conditions of the human eye and write prescriptions for corrective lenses, both of which are considered the practice of optometry. Furthermore, a person having ordinary skill in the art at the time of the '062 Patent, such as an ophthalmologist with two years of experience as identified by Plaintiff,[2] would have knowledge of the licensing requirement.

Accordingly, the Court construes the disputed term eye-care practitioner in line with Defendants' proposed construction. Thus, "eye-care practitioner" as used in the '062 patent is an eye care professional qualified and licensed to review and evaluate results generated by eye examination tests and procedures to provide any needed diagnoses and prescriptions, in contrast to a technician who may conduct eye examination tests and procedures but is not qualified and licensed to perform such review and evaluation.

- **"audio response system"**

Plaintiff proposes that the Court construe the term audio response system to mean "one or more audio devices (e.g., a speaker and a microphone) that output questions to and receive responses from the customer during the eye health or vision examination." *See* DE 70 at 20. Defendants propose that the Court construe this term to mean "hardware and software, such as speakers, microphones, voice recognition software and text-to-voice software, utilized by the server to present questions to the eye examination customer and receive from the customer audio responses, in contrast to a teleconferencing system in which a human asks the customer questions, hears the answers and remotely controls the ophthalmic equipment." *See* DE 73 at 15. The parties do not dispute that the audio response system includes physical components such as

---

[2] *See* DE 70-3 at 7. Plaintiff's expert identifies a person having ordinary skill in the art as an ophthalmologist with approximately two years of industry experience as well as experience with IT and/or networking systems. Plaintiff's extrinsic evidence in the form of Dr. Schuette's opinion is inconsistent with the intrinsic record and is, therefore, both unhelpful and unpersuasive to this Court. Because the Court bases its decision herein on the intrinsic evidence in the court record, Defendant's Motion to Strike Dr. Schuette [DE 71] is denied as moot.

microphones and speakers, but rather, the dispute centers on whether the audio response system also includes software that enables the system to speak to the customer and to recognize the responses from the customer. *See* DE 70 at 20-21, DE 73 at 15.

Plaintiff's proposed construction is not supported by the intrinsic evidence. The term "audio response system," as used in the claim, must itself be "configured to present questions to and receive responses from the customer." DE 70-1 at 51:51-53. Plaintiff provides no evidence that audio devices such as a speaker and microphone alone can perform the functions required by the claim. There is no dispute that a teleconferencing system has microphones and speakers, but a teleconferencing system requires a human, such as remote eye-care practitioner, not the audio equipment, to present the questions and hear the customer's responses. It is clear from the intrinsic record that the human is not the audio response system. The claims recite the audio response system as a limitation distinct from the eye-care practitioner. The specification describes the use of the audio response system in the automated embodiment. Further, the audio response system was added to overcome a rejection based on prior art systems in which the questions are presented and responses received by a human.

The claim further recites and requires that the subjective portion of the eye examination administered by the server uses an iterative process that includes: "based on the responses received from the customer via the audio response system, automatically adjusting ophthalmic equipment." *Id*. at 51:61-63.

Although the specification's description is limited, the Court finds its disclosure of audio response system instructive. In particular, the specification states:

> [A]n audio response system… may comprise and utilize various systems, devices, and **software**, such as speakers, microphones, **voice recognition software, text to voice software**, etc.…

*Id.* at 22:60-63 (emphasis added).

> **[T]he audio response system may be used** in connection with the administration of one or more eye health and/or vision tests, **such as to ask the customer questions, receive responses and selections from the customer**, and/or provide instructions and directions to the customer. In certain of these embodiments, the questions or other audio outputs may be based on a stored set of predefined questions and/or may be selected or determined based on the customer's responses to previous questions or the measurements or results of prior tests or procedures administered to the customer.

*Id.* at 23:4-14 (emphasis added).

After this general description, the specification describes the audio response system only one time in connection with the embodiments for an **"automated refractive process"** that span from 25:36 to 27:18 in the '062 Patent. In this description, the specification states: "In certain embodiments, this may include an iterative process in which powered lenses are placed in front of the customer's eyes using auto-phoropter 141 and/or lens houser 142, **questions are presented to and responses are received from the customer using the customer interface (e.g., through the audio response system)**, and based on the customer's responses, the powered lenses are switched with lenses having a different power, and so on." DE 70-1 at 26:3-11 (emphasis added).

Similarly, near the end of the description of these "automated refractive process" embodiments, the specification makes a lone reference to an "automated voice response system." *See* DE 70-1 at 26:63 – 27:8. It is clear from the specification that "audio response system" and "automated voice response system" are referring to the same component, and that this component must include software so that it may be "configured to present questions to and receive responses from the customer" as required by the claim.

Lastly, the prosecution history relating to audio response system confirms the proper construction evidenced by the claims and specification. In response to a second obviousness

rejection 35 U.S.C. § 103, based primarily on the Franz reference, the Applicant made substantial amendments to the claims which included the addition of the audio response system. In connection with these claim amendments, the Applicant stated:

> [a]n audio response system is ***configured to interact*** with a customer while the subjective portion of the eye examination is administered. More specifically, the [automated and iterative] process [of the server] selects questions to be output to a customer based on objective measurements… and the responses that are received from the customers via the audio response system. The ophthalmic equipment utilized in administering the subjective portion of the eye examination is then automatically adjusted or controlled based on the feedback provided to the audio response system."

DE 67-2 at 735 (emphasis added).

In arguing that its claim amendments distinguished over the cited Franz reference, Applicant first explained that Franz discloses a "teleconference system" that facilitates communication between the eye care practitioner and the patient/technician and that "the system therein may utilize 'voice input capabilities' in some very limited circumstances." *See* DE 67-2 at 731. The Applicant further argued that "[t]he references do not disclose or suggest anything that is even remotely related to the above amendments incorporated into Applicant's claims. Franz explains that the system therein may utilize 'voice input capabilities' to perform some basic data entry functions such as filling out a questionnaire that collects information for a patients' medical history." DE 67-2 at 735-36.

Thus, the audio response system was argued to be something more than mere audio devices such as a microphone and speaker. Consistent with the plain language in the claim and the specification, Applicant's representations and arguments to the Patent Office explain that the claimed "audio response system" is more than a system in the prior art cited by the Examiner that performs mere "voice input capabilities." Plaintiff's proposed construction that would be satisfied by mere microphones and speakers is overly broad and attempts to recapture scope that

was disclaimed in the argument to overcome the prior art. Competitors are entitled to rely on the representations an applicant makes to the Patent Office to determine scope of patent rights and lawful conduct such as designing around a patented invention. *Biogen Idec, Inc. v. GlaxoSmithKline, LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (citing *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372 (Fed.Cir.2005)). Accordingly, the Court adopts Defendants' proposed construction for the term "audio response system."

- **"Based on the responses received from the customer via the audio response system, automatically adjusting ophthalmic equipment"**

Plaintiff seeks to avoid construction of a critical aspect of the disputed phrase by contending that "based on the responses received from the customer via the audio response system" does not need to be construed because its plain and ordinary meaning is readily understood, and that the phrase "automatically adjusting the ophthalmic equipment" should be construed to mean "the equipment controller receiving and processing instructions to adjust (e.g., move, position, or modify) ophthalmic equipment." *See* DE 70 at 15-17. Defendants propose that the Court construe this phrase to mean "the server hardware and software is configured to automatically transform the responses received through the audio response system into instructions to adjust the ophthalmic equipment without requiring assistance from an eye care practitioner or on-site technician." *See* DE 73 at 23.

Plaintiff's proposed construction that includes "the equipment controller" is not consistent with the claim language which expressly recites "responses received from the customer **via the audio response system**." The equipment controller is a separate structural component in the claim from the audio response system used in the automated and iterative process of the server. *See* DE 70-1 at 51:37-38, 50-52. Also, as noted above, "via the audio

response system" was added by the amendment to the claim. Applicant could have amended the claim to recite "via the equipment controller," but instead added a new structural element: the audio response system and the requirement that the server automatically adjusts the equipment *based on responses received via the audio response system*. Separate claim limitations are separate components of a claimed invention. *See, Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) (citing *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

The Court also notes that the express claim language requires that the audio response system, not the equipment controller, is utilized by the server during a subjective portion of the eye examination to present questions and received responses from the customer. '062 Patent, 51:50-53. It is clear that the server performs this aspect of the eye examination administration. While claim 13 recites a number of operational elements, the claim is not presented as a method claim but rather as an apparatus claim reciting a server structurally *configured to* perform these operations.

Applicant's own description of the invention to overcome the prior art rejection during prosecution confirms this construction. Indeed, the Court finds that the prosecution history of the claim amendment for "automatically adjusting ophthalmic equipment based on the responses received from the customer via the audio response system" is a clear and unmistakable disclaimer of the asserted scope of an audio response system to require only audio devices such as microphones and speakers.

In its Amendment of May 4, 2015, the Applicant organized its arguments in a section "IV. Applicant's Reply to Rejections under § 103." EE 67-2 at 728. In this section, Applicant summarized the examiner's rejections based on Franz in view of a secondary reference to Schoenberg, followed by an overview of Applicant's invention and an overview of the cited references Franz and Schoenberg. *Id.* at 728-733. Then, in the following section "C. Independent Claims 1, 14 and 26" Applicant clearly argued:

> The features incorporated into the independent claims are directed to novel features that assist with administering the subjective portions of eye examinations to customers. For example, amended claim 1[3] recites:
>
> *at least one server configured to …*
>
>> administer the one or more tests to customers during the eye examinations…
>>
>> the eye examinations including …subjective portions that **utilize an audio response system that is configured to present questions and receive responses from the customers**…
>>
>> wherein the subjective portions of the eye examinations are administered using an iterative process that includes:
>> …
>>
>> **based on the responses received from the customers via the audio response system, automatically adjusting the ophthalmic equipment** utilized in administer the subjective portion of the eye examination.

*Id.* at 734-735 (emphasis added).

After presenting these amendments, the Applicant argued:

> The amended features incorporated into claim 1 relate to the automated and iterative process described above which provides assistance with administering subjective portions of eye examinations. An audio response system is configured to interact with a customer while the subjective portion of the eye examination is

---

[3] The claim amendments and arguments apply equally to claim 13 (application claim 14) at issue. *See* DE 67-2 at 737.

administered….**As explained above, this automated and iterative process** for administering the subjective portion of an eye **examination provides a number of advantages** (e.g. including improved accuracy of tests, **ability to conduct tests without assistance from an eye practitioner or on-site technician**….

*Id.* (emphasis added).

These claim amendments and associated representations confirm a number of points that are clear from the claim and specification. The Applicant amended the claim so that it is the server, not an eye-care practitioner, that is performing the subjective portion of the eye examination. This subjective portion involves an automated and iterative process performed by the server. The server utilizes an audio response system to present questions and receive responses from a customer. Based on the customer responses received by the audio response system, the server automatically adjusts the equipment. These features as added to the claim to overcome the rejections based on Franz and Shoenberg provide advantages over the prior art including "the ability to conduct tests without assistance from an eye practitioner or on-site technician."

Contrary to Plaintiff's arguments, the server's administration of these tests does not preclude the involvement of the eye-care practitioner in administering an eye examination. In discussing the automated refractive process, the specification states that "the customer diagnostic center may establish a connection with the remote practitioner prior to, during, or after performing the automated refraction procedure, such as to allow the remote practitioner to monitor and control the tests, view and interact with the customer, review and analyze the examination data, and/or provide the evaluation data in real-time." DE 70-1 at 26:46-52. Thus, the eye-care practitioner can administer aspects of the eye-examination in addition to automated iterative process performed by the server.

Further, the Court notes that the Examiner rejected Applicant's claims under 35 U.S.C. § 101 as being "directed to the abstract idea of organizing human activities of remotely conducting eye examinations by providing the patient with instructions to administer the exam and forwarding the results of the exam to the physician for analysis." DE 67-2 at 660. The claim amendments and associated arguments and representations made to the examiner require that the server utilizing an audio response system performs an automated and iterative process to administer a subjective portion of an eye examination. For example, the Applicant amended the claim to include "automatically adjusting ophthalmic equipment" and made the following representations to the Patent Office:

> The objective measurements and subjective responses [received by audio response system] may be automatically transformed into instructions to control or adjust settings for the ophthalmic equipment being utilized to administer the subjective portion of the eye examination.

DE 67-2 at 730.

> The automated and iterative process for administering the subjective portion of an eye examination provides a number of advantages… **it permits the subjective portion of an eye examination to be conducted without assistance from an eye care practitioner or on-site technician**, and can significantly reduce the time, inconvenience and expense of conducting an examination."

DE 67-2 at 730-31 (emphasis added).

> The ophthalmic equipment utilized in administering the subjective portion of the eye examination is then automatically adjusted or controlled based on the feedback provided to the audio response system.

DE 67-2 at 735.

> Franz does not disclose or suggest ANY of the amended features incorporated into claim 1. For example, Franz does not teach or suggest… **automatically adjusting the ophthalmic equipment based on the responses received from the customers via the audio response system**."

DE 67-2 at 736 (emphasis added).

Cited references do not disclose or suggest… administering subjective portions of eye examinations to customers using **the claimed iterative process that utilizes an audio response system to automate** certain aspects of administering an eye examination.

DE 67-2 at 738 (emphasis added).

Thus, it is clear that "automatically adjusting ophthalmic equipment" requires more than an eye-care practitioner controlling equipment. Indeed, the patent examiner was persuaded to withdraw rejections based on these amendments and arguments, and stated that "the changes made by the Applicant to the claims in the amendment submitted May 4, 2015… limitations added upon amendment **including automatically adjusting ophthalmic equipment based on responses received from the customers via an audio response system** are limitations considered significantly more by improvement to another technology or technical field…" DE 67-2 at 751 (emphasis added). While the Court finds the Applicant's statements with regard to "automatically adjusting ophthalmic equipment" sufficiently clear, the Court notes that prosecution history disclaimer may also be applied based on the examiner's reasons for allowance. *See Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1135-36 (Fed. Cir. 2018) (finding that prosecution disclaimer applied when the "examiner's 'Reasons for Allowance' made clear that the examiner and the applicant understood what the applicant had changed, and what the claim amendment required.").

The Court is not persuaded by Plaintiff's arguments that the statements made by the Applicant to the Patent Office are not relevant because they are permissive in nature. The representations and arguments were not simply passing comments made to provide background; the statements were made to explain narrowing limitations added to the claims in the context of overcoming multiple rejections and were persuasive because they distinguished over the cited references and were considered to be significantly more than the abstract idea of organizing

human activities.  The argument and presentation made to explain the "automated and iterative process" included the benefit that provides the ability of the subjective portion of an eye examination to be conducted without assistance from an eye care practitioner or on-site technician.  Thus, Applicant did not merely argue that the features permit testing without human assistance, Applicant argued it provided an ability not available before.  As noted above, the Applicant presented and argued that the features added to the claims through the amendment provided the **ability** to conduct the subjective portion without human assistance.  Plaintiff has provided no evidence that audio devices such as speakers and microphones can provide this ability.

Plaintiff's proposed construction is improper because it is a litigation-driven interpretation that contradicts the position it took in the public record to secure the patent.  *See Southwall Tech,* 54 F.3d at 1578.

Likewise, the Court rejects Plaintiff's argument that dependent claims 15 and 17 necessitate an interpretation for "automatically adjusting ophthalmic equipment" that permits the eye-care practitioner to control the ophthalmic equipment via the equipment controller.  The server's administration of the iterative process including "based on the responses received from the customer via the audio response system, automatically adjusting ophthalmic equipment" done by the server does not preclude involvement by the eye-care practitioner in the eye examination administration.  As discussed above, the lone automated process embodiment described in the specification using the audio response system discloses that the server can also establish a connection with an eye-care practitioner **before, during or after** the automated process.  So, too, dependent claims 15 and 17 provide further operations of the server in addition to operations of the server that 20/20 added to independent claim 13 during prosecution to secure

its allowance. Moreover, the clear and unambiguous statements made by the Applicant to the Patent Office, take precedent over any inconsistency with a dependent claim. *See Biogen Idec v. GlaxoSmithKline*, 713 F.3d 1090, 1096 (Fed. Cir. 2013) (finding that prosecution history disclaimer overcomes dependent claim differentiation.)

Accordingly, the Court adopts Defendants' proposed construction for the phrase "based on the responses received from the customer via the audio response system, automatically adjusting ophthalmic equipment."

## Conclusion

For the foregoing reasons, it is **ORDERED and ADJUDGED** as follows:

1. An "equipment controller" is a processing unit, micro-controller, or computing device that receives instructions to control ophthalmic equipment.

2. "Customer evaluation data" is information generated by the eye-care practitioner based on a review and evaluation of customer examination data generated by the ophthalmic equipment during one or more of the eye examination tests.

3. An "eye-care practitioner" is an eye care professional qualified and licensed to review and evaluate results generated by eye examination tests and procedures to provide any needed diagnoses and prescriptions, in contrast to a technician who may conduct eye examination tests and procedures but is not qualified and licensed to perform such review and evaluation.

4. "Audio Response System" means "hardware and software, such as speakers, microphones, voice recognition software and text-to-voice software, utilized by the server to present questions to the eye examination customer and receive from the customer audio responses, in contrast to a teleconferencing system in which a human asks the customer questions, hears the answers and remotely controls the ophthalmic equipment."

5. "Based on the responses received from the customer via the audio response system, automatically adjusting ophthalmic equipment" means "the server hardware and software is configured to automatically transform the responses received through the audio response system into instructions to adjust the ophthalmic equipment without requiring assistance from an eye care practitioner or on-site technician."

Defendant's Motion to Strike Expert [DE 71] is **DENIED AS MOOT** for the reasons set forth above.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 6th day of November, 2018.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record